# IN THE COURT OF APPEALS OF IOWA

No. 14-1727
Filed January 27, 2016

**ROGER TIEMESSEN,**
      Plaintiff-Appellant,

**vs.**

**ALLIANCE PIPELINE (IOWA) L.P.**
**and ALLIANCE PIPELINE, INC.**
      Defendants-Appellees.
_____

      Appeal from the Iowa District Court for Chickasaw County, Richard D.
Stochl, Judge.


      Roger Tiemessen appeals from the district court's entry of summary
judgment in favor of Alliance Pipeline.  **REVERSED AND REMANDED.**



      Nathanial W. Schwickerath of Schwickerath, P.C., New Hampton, for
appellant.

      Johannes H. Moorlach of Whitfield & Eddy, PLC, Des Moines, and
Nicole M. Moen and Haley L. Waller Pitts of Frederickson & Byron, P.A.,
Minneapolis, Minnesota, for appellees.



      Heard by Danilson, C.J., and Mullins and McDonald, JJ.

**DANILSON, Chief Judge.**

Roger Tiemessen appeals from the district court's entry of summary judgment in favor of Alliance[1] on his breach-of-contract claim. We reverse and remand, concluding Tiemessen has raised a genuine issue of material fact.

**I. Background Facts and Proceedings.**

The following facts are not in dispute. Tiemessen's parents, Raymond and Alice Tiemessen, own the farmland at issue in this lawsuit—tracts 133, 134, and 134A. Tiemessen has rented the land from his parents for many years. He pays "annual farm cash rent to [his parents] at the rate of $100.00 per acre." Although Tiemessen and his parents had a written lease, at some point, it has been lost.

On February 9, 1999, Raymond and Alice Tiemessen entered into an easement and right-of-way agreement with Alliance. The easement provides that Alliance will "have all privileges necessary or convenient for the full use of the rights herein granted." It also provides that Alliance "agrees to pay for damages to crops, pasture, fences, drainage tile, structures, and timber which may arise from the laying, constructing, maintaining, operating, repairing, replacing or removing of the said pipeline." In addition, the easement provides that Alliance will construct and operate the pipeline consistent with an Agricultural Impact Mitigation Agreement (AIMA) between Alliance, the Iowa Attorney General's Office, and the Iowa Department of Agriculture. The AIMA provides that Alliance "shall reasonably compensate Landowners and/or Tenants for damages, losses

---

[1] For our convenience, we use Alliance to refer to both defendants—Alliance Pipeline (Iowa) L.P. and Alliance Pipeline, Inc.

or inconvenience caused by [Alliance] . . . associated with construction, installation, operation, maintenance and existence of the pipeline," including "loss of crops, pasture, timber, trees, produce, livestock, fences, drain tiles, irrigation systems or equipment."

In exchange for the easement, Alliance paid Raymond and Alice Tiemessen $26,232 (the easement payment), which represents $21,438 for a permanent right-of-way over 7.94 acres; $3899 for temporary work space over 7.22 acres; and $875 for additional temporary work space over 1.62 acres.

Alliance also paid Raymond and Alice Tiemessen $117,662 for damages "listed on the Advance Damages Computation Form attached hereto as Appendix A" (the restoration payment), which included $20,160 for corn crop loss on 16.8 acres for two years; $8132 for land restoration on 16.8 acres; $4620 for rock removal on 16.8 acres; $2520 for dust abatement on 16.8 acres; $9780 for inconvenience of production due to realignment of pipeline; $7450 for livestock relocation; and $65,000 for drain tiling. In connection with the restoration payment, Raymond and Alice Tiemessen executed a release, agreeing they accepted the restoration payment:

> [I]n full payment of settlement, in advance, for all damages listed on the Advance Damages Computation Form attached hereto as Appendix A. In consideration of said advance payment, [Raymond and Alice Tiemessen] do hereby release and forever discharge [Alliance] from any and all causes of action, suits, debts, claims, expenses, general damages, interest, costs and demands whatsoever, at law and in equity, against [Alliance] which [they] ever had, now have, or which [they], [their] insurers, heirs, executors, administrators, successors or assigns hereafter can, shall, or may have in the future relating to the damage items listed in Appendix A, arising out of or in connection with, resulting or alleged to have resulted from, construction or surveying, over, under or on the following lands . . . .

In addition, Raymond and Alice Tiemessen agreed: (1) to waive "the procedures for determining damages set forth in section 19 of the [AIMA]" and (2) that Alliance's obligations under the AIMA with respect to the damages listed in in Appendix A were waived and/or satisfied.

Alliance installed the pipeline on tracts 133, 134, and 134A in 1999 and completed restoration activities on those tracts in 2000. Since completing restoration activities, the pipeline and the tracts farmed by Tiemessen have remained undisturbed by Alliance. Alliance has not conducted any affirmative activities on the tracts and has not entered the tracts.

Since the pipeline's construction, Tiemessen has continued to farm his parents' land. At Tiemessen's request, in 2010, 2011, and 2012, Alliance sent a certified agronomist to the parcels rented by Tiemessen to collect data regarding the yield differentials between the easement area and the non-easement area of the parcels. Historically, Alliance has collected yield data regarding on and off easement areas as part of a larger program run by Alliance to maintain landowner relationships. As part of that program, and to foster goodwill, Alliance voluntarily offered to pay Tiemessen the value of the yield differences, based on the data collected by the certified agronomist. This program ended in 2012.

Starting in 2010, Tiemessen rejected Alliance's voluntary offers and instead demanded payments for "crop losses."

Roger Tiemessen filed this action on July 12, 2013, seeking damages as a "third party beneficiary" of the easement for Alliance's "failure to pay crop losses as required by the easement."

Alliance filed a motion for summary judgment, asserting (1) Tiemessen had not suffered "damage to crops" under the easement, (2) Tiemessen lacked standing to assert claims for soil productivity, and (3) the landlord had previously released any claims for soil productivity. In response, Tiemessen stated he was not making a claim related to soil productivity; rather, his claim is "for damages to his crops occasioned by the operation of the pipeline pursuant to the easement and by the operation and existence of the pipeline pursuant to the mitigation agreement that Alliance executed with the State of Iowa." He argued, "The operation of the pipeline causes damage to his crops each year and he is entitled pursuant to the easement to make a claim for that damage."

On September 16, 2014, the district court issued a ruling, concluding:

> Roger claims his yield from crops grown in the easement area is less than yield from crops grown outside of that area. He does not allege that Alliance performed any affirmative act that damaged his growing crops. Therefore, his claim is not one of crop damage but rather one of injury to the land where his crops are growing. Iowa courts distinguish between the two. In *Grell v. Lumsden*, 220 N.W. 123, 125 (Iowa 1928), the court discussed the difference between direct damage to items growing upon land and damage to the land itself. In this case, Roger is making no claim that Alliance performed any activity that damaged his crops. He is simply claiming that the easement area is not as productive. His claim is clearly one of damage to the land itself and not one of damage to a specific crop.
> It is undisputed that Roger is a tenant on his parents' land. He does not own the ground he claims is faulty in its productivity. If he has any dispute with his ability to grow crops in the easement area, his dispute is with the landlord and not Alliance. He is free to negotiate a lower rental rate with the landlord if he finds the easement area defective. He has no direct cause of action against Alliance.
> Because the court finds that Roger's claim must fail due to lack of standing to sue Alliance under the easement, the court need not address the other issues raised in Defendant's motion for summary judgment.

Tiemessen appeals.

## II. Scope and Standard of Review.

We review summary judgment rulings for correction of errors at law. *Baker v. City of Iowa City*, 867 N.W.2d 44, 51 (Iowa 2015). Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Iowa R. Civ. P. 1.981(3). "The moving party has the burden of showing the nonexistence of a material fact." *Hlubek v. Pelecky*, 701 N.W.2d 93, 95 (Iowa 2005).

> An issue of fact is "material" only when the dispute involves facts which might affect the outcome of the suit, given the applicable governing law. An issue is "genuine" if the evidence in the record is such that a reasonable jury could return a verdict for the non-moving party. We view the evidence in the light most favorable to the nonmoving party, who is entitled to every legitimate inference that we may draw from the record.

*Nelson v. Lindaman*, 867 N.W.2d 1, 6-7 (Iowa 2015) (citations omitted).

## III. Discussion.

*General easement principles*. "'An easement is a liberty, privilege, or advantage in land without profit, existing distinct from ownership.'" *Keokuk Junction Ry. Co. v. IES Indus., Inc.*, 618 N.W.2d 352, 355 (Iowa 2000) (quoting *Hawk v. Rice*, 325 N.W.2d 97, 98 (Iowa 1982)). "Easements may be created in one of three ways: (1) express written grant; (2) prescription; or (3) implication." *Johnson v. Kaster*, 637 N.W.2d 174, 178 (Iowa 2001). "While there are different methods of creating easements, the easements created do not differ." *McKeon v. Brammer*, 29 N.W.2d 518, 522 (Iowa 1947).

> "An easement is an interest which one person has in the land of another. Its most important characteristic is that its burdens fall upon the possessor of the land with respect to which it constitutes

an interest regardless of the circumstances under which it was created or under which he entered into possession. This characteristic is expressed in the statement that the land in which an easement exists constitutes a servient tenement. Since an interest consists of one or more legal relations and legal relations exist only between persons, such a statement must be deemed metaphorical. It does, however, emphasize the fact that the subjection of a possessor of land to an easement in his land is based upon his possession rather than upon his participation in the creation of the easement or his succession in interest to another who, in the first instance, created it." Restatement Property § 450. "Because the identity of the possessor of land is not material in determining his liability to an easement, a language technique has developed in which the land itself is described as owing the service to which the owner of the easement is entitled and as being itself subject to the easement. Such a description is, of course, figurative. It is, nevertheless, helpful as a reminder of the close association of the burden with the possession, and in emphasizing that the burden rests upon the possessor. This burden is not a normal incident of possession because it is not found to exist without proof of a separate creation. Yet, when proved to have been created, it rests upon the possessor of the land subject to it as possessor and so becomes incidental to his possession." Restatement Property § 455.

*Id.* at 524.

"Once a valid easement has been created and the servient landowner justly compensated, the continued use of the easement must not place a greater burden on the servient estate than was contemplated at the time of formation." *Keokuk Junction*, 618 N.W.2d at 355.

*Express easement.* The easement here is for a perpetual right-of-way for Alliance's natural gas pipeline—constructed and installed in a manner consistent with the AIMA—and provides that Alliance will "have all privileges necessary or convenient for the full use of the rights herein granted." It also provides that Alliance "agrees to pay for damages to crops, pasture, fences, drainage tile,

structures, and timber which may arise from the laying, constructing, maintaining, operating, repairing, replacing or removing of the said pipeline."

Tiemessen contends he has sufficient stake in the easement to obtain judicial resolution. He argues the district court's characterization of his claims is faulty and his claims "relate only to damage to his crop as referred to in the easement caused by the operation of the Defendants' pipeline." He maintains he has raised a material issue of fact because:

> Plaintiff's expert, Don Stille, a crop adjuster with more than fifteen years of experience provided an affidavit in which he states: "I have noticed in my observation of the soil on these tracts that the soil quality is similar both on and off the right of way, but that there is a noticeable difference in the crop grown off and on the right of way." Mr. Stille opines that the "variation in the crop is attributable primarily to the existence and operation of the pipeline through Mr. Tiemessen's leasehold, which generates heat in the ground. This heat causes the ground to thaw early and drain faster in the spring and causes evaporation throughout the year, causing damage to Mr. Tiemessen's crops." Roger Tiemessen confirmed that the ground in the right of way area thaws at a different rate than the surrounding ground.

In addition, Tiemessen argues the course of dealings between him and Alliance

> indicates that [Alliance] w[as] of the understanding, as was [Tiemessen], that [Tiemessen] would continue to receive payments for damages to his crops caused by the operation and existence of the pipeline as [Alliance] annually attempted to resolve these claims, and more importantly, when they could not be resolved admitted to liability but not the damages amount when [Tiemessen] had previously filed suit against them.

In response, Alliance does not challenge Tiemessen's standing as a tenant. However, it argues, first, that the district court properly concluded Tiemessen's claim was not one of damages to crops, but rather injury to the land. Alliance also maintains any claim of injury to the land was released by Raymond and Alice Tiemessen, who "were already paid to restore the land after the

pipeline's construction."[2]  Further, Alliance argues Tiemessen failed to provide any admissible evidence upon which he could rely to resist the motion for summary judgment; his petition "contains no reference to the heat allegations," his discovery responses fail to provide support for this theory, and no expert was identified in connection with a claim alleging yield differentials on and off the easement area.  Finally, Alliance contends its voluntary payments in prior years do not foreclose its ability to contest Tiemessen's claim now.

We first note that Tiemessen is not seeking damages for crop damage previously paid by Alliance to Raymond and Alice Tiemessen.  At the time the easement agreement was executed, crop damages were paid for only two years, and the agreement provides that Alliance agreed to pay for crop damages that may arise in the future "from laying, constructing, maintaining, operating, repairing, replacing or removing" the pipeline.

Specifically, the language upon which Tiemessen relies for this action is that Alliance "agrees to pay for *damages to crops* . . . which may arise from the . . . operating . . . of the said pipeline."[3]  (Emphasis added.)  The district court rejected Tiemessen's interpretation of the easement.  We must determine whether the district court's interpretation was in error.

---

[2] Alliance and the district court state Tiemessen lacks standing to assert a claim of decreased soil productivity as his remedy lies in the rental paid.  While Tiemessen may have the ability to negotiate a lower rent on the land subject to the easement, we do not believe that avenue *necessarily* negates this contract claim.

[3] Though not referenced in the petition, in response to the summary judgment motion, Tiemessen also noted language of the AIMA that Alliance "shall reasonably compensate Landowners and/or Tenants for damages, losses or inconvenience caused by [Alliance] which occurred on or off the Pipeline Right-of-Way associated with construction, installation, operation, maintenance and existence of the Pipeline," including "*loss of crops*."  (Emphasis added.)

"'Interpretation of a contract is a legal issue unless the interpretation of the contract depends on extrinsic evidence.'" *Alta Vista Props. L.L.C. v. Mauer Vision Ctr.*, *P.C.*, 855 N.W.2d 722, 726 (Iowa 2014) (quoting *Pillsbury Co. v. Wells Dairy*, *Inc.*, 752 N.W.2d 430, 435 (Iowa 2008); *see also Hartig Drug Co. v. Hartig*, 602 N.W.2d 794, 797 (Iowa 1999) ("[W]hen no relevant extrinsic evidence exists, the resolution of any ambiguity in a written contract is a matter of law for the court.").

We apply ordinary contract principles to determine the meaning and legal effect of the easement. *See Alta Vista*, 855 N.W.2d at 727. Generally, contracts are interpreted based on the language within the four corners of the document. *Clinton Physical Therapy Servs.*, *P.C. v. John Deere Health Care*, *Inc.*, 714 N.W.2d 603, 615 (Iowa 2006); *see also Smidt v. Porter*, 695 N.W.2d 9, 21 (Iowa 2005) ("It is a fundamental and well-settled rule that when a contract is not ambiguous, we must simply interpret it as written."). When words in a contract are not defined, we give them their ordinary meanings. *Hartig Drug Co. v. Hartig*, 602 N.W.2d 794, 797 (Iowa 1999). "Moreover, particular words and phrases are not interpreted in isolation. Instead, they are interpreted in a context in which they are used. Furthermore, the words are given the meaning at the time the contract was executed." *Id.* at 798 (citations omitted).

> The primary goal of contract interpretation is to determine the parties' intentions at the time they executed the contract. Interpretation involves a two-step process. First, from the words chosen, a court must determine what meanings are reasonably possible. In doing so, the court determines whether a disputed term is ambiguous. A term is not ambiguous merely because the parties disagree about its meaning. A term is ambiguous if after all pertinent rules of interpretation have been considered a genuine

uncertainty exists concerning which of two reasonable interpretations is proper.

*Walsh v. Nelson*, 622 N.W.2d 499, 503 (Iowa 2001) (internal citations omitted).

Tiemessen argues the easement does not define "damages to crops," but that phrase is broad enough to cover the differential in crop production on and off the easement property. The word "damage" means "physical harm that is done to something." http://www.merriam-webster.com/dictionary/damage (last visited on December 29, 2015). The word "crop" means "a plant or plant product that is grown by farmers." http://www.merriam-webster.com/dictionary/crop (last visited on December 29, 2015). Typically the phrase "damages to crops" would mean the physical harm to plants grown on the land. This definition is consistent with the discussion in *Martin v. Jaekel*, 188 N.W.2d 331, 336 (Iowa 1971), where the court discusses the proper measure of damages for the "destruction" of a growing crop.

The district court relied upon a prior supreme court opinion, noting that case discussed the difference between direct damage to items growing upon land and damage to the land itself. *See Grell v. Lumsden*, 220 N.W. 123, 125 (Iowa 1928). *Grell* dealt with an action to recover damages to real property. 220 N.W. at 124. Grell (the appellee) was the owner of a tract of land containing 112 acres. *Id.* Lumsden (the appellant) was the owner of all the coal underlying 16.75 acres of that tract. *Id.* Lumsden also had acquired "the right to cut and use all the timber now standing on or above described land and lying directly east of the mouth of said mine for any purposes connected with operation of the

mine." *Id.* Lumsden appealed from a jury verdict and judgment for Grell. *Id.* at 123.

The *Grell* court discussed the difficulty in applying "rules of the admeasurement of damages." *Id*. at 125. The court stated:

> Regard must always be had to the basic principle upon which damages are allowed; namely, *compensation for the injury suffered.*
>
> Three distinct rules, pertinent to the questions before us, are well settled in this state. If the thing *destroyed* or removed from real property, although a part thereof, has a value which can be accurately measured or ascertained without reference to the soil on which it stands, the recovery is the value of the thing thus destroyed or removed, and not the difference in the value of the land.
>
> Where the character of the injury is such that the premises may be reasonably restored to as good condition as they were before, the measure of recovery is the fair and reasonable cost and expense of such restoration.
>
> If the character of the injury is such that the property cannot be repaired or restored to its former condition at a reasonable expense, or is to the soil, or involves the *destruction* of trees having a particular value as a part thereof, such as orchards or shade trees, the measure of recovery is the difference between the value of the real property immediately before and after the injury.

*Id.* (emphasis added and citations omitted). In *Grell*, the court ultimately determined:

> It is apparent from the testimony that the trees had a value separate and distinct from the soil, which could be definitely and accurately determined. No damage was occasioned to the soil by the removal of the trees. This being true, we are of the opinion that the measure of damages for the cutting and appropriation of the trees was the fair and reasonable market value thereof, when severed from the soil.

*Id.* at 126.

In another easement case involving damages to crops, a landowner sought to recover damages to crop and timber occasioned by the gas company's

replacement of a pipe in connection with its pipeline easement. *Williams v. Northern Nat. Gas Co.*, 136 F. Supp. 514, 515 (8th Cir. 1955). Northern had agreed "to replace and/or rebuild to the satisfaction of Grantor or his representative any and all damaged parts of all drainage systems that may be damaged by construction of said pipe lines; and also to pay any and all damages to premises, such as damage to trees, shrubs, and buildings—this in addition to damage to crops and fences." *Id.* at 516. The trial court determined that the landowner was entitled to an amount that was the "result of the *destruction* of the growing crops and timber." *Id.* at 523.

In the case before us, the easement agreement states that Alliance agrees to pay for "damages to crops." However, there was no physical harm, injury, or destruction of the plants on the easement.

Moreover, in the context of a taking claim, one court has noted:

Included as elements of compensation to an owner from the taking of an underground pipeline easement are damage to fences, *loss of crops, impaired fertility* or cost of restoration, inconvenience incident to the use thereof, and any other loss reasonably attributable to the taking of the easement, as well as compensation for the estate taken, determined upon the usual principle of willing seller and willing buyer dealing at arms-length, giving due consideration to the reserved right of re-entry on the part of the condemner.

*Am. Louisiana Pipe Line Co. v. Kennerk*, 144 N.E.2d 660, 665 (Ohio Ct. App. 1957) (emphasis added). The Ohio court recognized a differentiation of loss of crops with impaired fertility.

The principles recited in *Grell* are also consistent with the finding in *Phillips Petroleum Co. v. Morris*, 518 S.W.2d 444 (Tex. Ct. App. 1975). In *Morris*, the plaintiffs sued the oil company that had formerly operated a well on land

covered by a lease. 518 S.W.2d at 445. After the oil company ceased operations, "Morris found that this land did not produce crops as it had before its use by Phillips and that some of the land would not bear crops at all." *Id.* The plaintiffs sued Phillips alleging that later planted crops did not mature and that Phillips was contractually liable to plaintiffs for damages by reason of the provision in the 1968 oil and gas lease which said: "The Lessee agrees to pay for damages to crops or improvements caused by operations of Lessee." *Id.* The court held the oil company "was not liable to [the plaintiffs] for the loss of anticipated future crops occasioned by *damage to the soil* as a result of the activities in question pursuant to Phillips' lease agreement with plaintiffs." *Id.* at 446 (emphasis added).

What is not fully answered in these summary judgment proceedings is whether Tiemessen's reduced yields are due to reduced infertility of the soil or heat radiating from the use of the pipelines causing drying in the nearby soil. We also observe that unlike the cases we have noted in respect to easements, here the AIMA specifically required Alliance to compensate tenants for damages or "losses" to crops:

> The Company shall reasonably compensate Landowners and/or Tenants for damages, losses or inconvenience caused by the Company which occurred on or off the Pipeline Right-of-Way associated with the construction, installation, operation, maintenance and existence of the Pipeline. These damages, losses or inconveniences may include but are not limited to loss of crops, pasture, timber, trees, produce, livestock, fences, drain tiles, irrigation systems or equipment.

We conclude the term "crop damages" may encompass more than physical damage to the standing crop. To interpret the easement as narrowly as

suggested by Alliance would allow it to escape its obligations under the AIMA, which requires compensation for crop damages and losses.

As we have noted, we agree with the district court that there was no physical injury to the crop similar to hail damage, wind damage, or crushing damage by machine or man. However, Tiemessen's petition sought recovery for "crop losses." In essence, he seeks damages for the continuing crop losses he incurs for reduced yields due to the operation of the pipeline as provided within his right under the AIMA.

Even if we disregard the AIMA in interpreting the easement, similar damages have been permitted by other courts. Damages were permitted for losses to an orange crop for several years due to cement dust from a nearby cement plant in *California Orange Co. v. Riverside Portland Cement Co.,* 195 P. 694, 696-97 (Cal. Dist. Ct. App. 1920). The cement dust interfered with the vitality of the orange trees and reduced their production. *California Orange*, 195 P. at 696. Here, Tiemessen contends heat radiating from the use of the pipeline dries the soil on and nearby the right-of-way, reducing his yields. *See id.*

In *Merrill v. Penrod*, 704 P.2d 950, 960 (Idaho Ct. App. 1985), the Idaho court noted that "the measure of damages for injury to a growing crop is the difference between the value of the crop actually raised upon the land and the crop which would have been raised upon it *under normal conditions* for the year in question." This is the type of damage for loss of crops Tiemessen seeks, and he has supported his claim for damages and his resistance to the motion by the affidavit of an experienced crop adjustor.

Our supreme court has also recognized damages for crop losses where the plants produced reduced yields due to corn borer infestation, a loss without any physical act of crushing or destroying of the entire plant. *See Renze Hybrids, Inc. v. Shell Oil Co.*, 418 N.W.2d 634, 639 (Iowa 1988) (stating "[i]t is clear that Renze sustained crop damage due to corn borer infestation," as alleged to have occurred because of a failure of an applied insecticide).

Tiemessen's affidavit states the pipeline generates heat because snow melts only in the pipeline right-of-way and another nearby pipeline does not have the same effect. According to Tiemessen, the ground in the right-of-way also thaws sooner in the spring and drains quicker than other land nearby. Tiemessen's crop adjuster also testified to the early thawing and draining of the right-of-way. On this record, we would agree with Alliance that neither Tiemessen nor the crop adjuster have the expertise to testify regarding soil fertility or the chemical properties of soil. However, we believe an experienced farmer and crop adjuster are competent to testify in respect to melting snow, thawing of soil, and—to a limited extent—soil drainage. We also believe they are competent to testify regarding the effect heat has on yields of crops even if they are unable to scientifically explain the effect on the plant itself. Alliance admits pipelines may cause increases in surface soil temperature. Alliance also presented evidence that increased soil temperatures cause minimal or no impact on crop yields. However, we are unable to make credibility findings in summary judgment proceedings because such determinations are reserved for the fact finder. *See Frontier Leasing Corp. v. Links Eng'g, LLC*, 781 N.W.2d 772, 776 (Iowa 2010).

We conclude Tiemessen has created a genuine issue of material fact by circumstantial evidence as to whether the operation of the pipeline has caused continuing crop losses recoverable as a third-party beneficiary to the easement agreement.

**REVERSED AND REMANDED.**